2009 Ark. App. 160

**Eurana JONES–LEE, Appellant,**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 08–1008.**

Court of Appeals of Arkansas.

March 4, 2009.

Robertson Law Firm, PLLC, by: Bonnie Robertson, North Little Rock, for appellant.

Gray Allen Turner, Office of Chief Counsel, Little Rock, for appellee.

Leah B. Lanford, P.A., by: Leah Lanford, Little Rock, for minor children.

WAYMOND M. BROWN, Judge.

Eurana Jones–Lee appeals from an order terminating her parental rights to her four children: Z.J. (born August 20, 2001), C.J. (born November 15, 2003), A.J. (born September 13, 2005), and C.S.J. (born March 26, 2007). She argues that the circuit court erred in determining that termination was in the children's best interest, that the Arkansas Department of Human Services (DHS) made a meaningful effort to rehabilitate the home and correct the conditions that caused removal, and that she failed to remedy the conditions that caused the children to be removed from the home. She also challenges the denial of her motion for a continuance, contending that it precluded her from presenting evidence regarding her current mental status. We affirm the termination order and the denial of her motion for a continuance.

*Factual and Procedural History*

This case began with a report of inadequate supervision of Jones–Lee's two oldest children. On February 10, 2007, DHS found five-year-old Z.J. and three-year-old C.J. unattended at their home. Jones–Lee left the children unsupervised while she attended church with one-year-old A.J. Z.J. and C.J. were immediately taken into emergency custody. At the time, Jones–Lee was seven months' pregnant with C.S.J. Two days later, the investigator spoke with Jones–Lee by telephone and Jones–Lee agreed to bring A.J. into DHS's office. However, Jones–Lee arrived without A.J. She told the investigator that she left the older children alone to go to church due to their behavior problems. She said that she did not have the patience to take the older boys to church and that she did not feel like "smacking" them. She explained that while she was at church, "God was watching the children." Jones–Lee further told the investigator that she could do whatever she wanted to with her children, that she did not have to answer to the investigator, and that she must answer only to God. Jones–Lee ad-

mitted to the investigator that she had been diagnosed with depression but said that she did not take her medication because she did not want to become dependent.

A.J. was not taken into custody until the probable cause hearing held February 16, 2007. C.S.J. was born on March 28, 2007. Two days later, DHS took emergency custody of him, and the circuit court subsequently found probable cause to continue the custody. All the children were eventually adjudicated dependent-neglected. The two older boys were placed in the same foster home; A.J. and C.S.J. were placed in separate foster homes. Jones–Lee was awarded supervised visitation. The case plan required Jones–Lee 1) to obtain stable housing and employment; 2) to complete parenting classes and demonstrate parenting skills; 3) to participate in psychological evaluations and follow any recommendations resulting therefrom; 4) to take medication as prescribed; 5) to refrain from illegal drugs and alcohol; 6) to maintain a clean and safe home; 7) to demonstrate the ability to protect and keep the children safe; 8) to take steps to resolve the paternity of one of the children; and 9) to participate in individual counseling.

Dr. Paul DeYoub performed a psychological evaluation of Jones–Lee on May 7, 2007. He considered Jones–Lee to be chronically ill because she displayed psychosis secondary to depression. He diagnosed Jones–Lee with major depression, recurrent and severe, with psychotic features; parenting problems; personality disorder, inadequate and dependent. Dr. DeYoub felt that reunification was not an option because Jones–Lee was "too disturbed." He did not think that reunification could be considered until Jones–Lee stabilized and participated in a regular routine with medication, a therapist, and a case manager. He recommended hospitalization or at least outpatient treatment and medication management.

As ordered, Jones–Lee began individual counseling with Fritzie Hemphill on June 12, 2007. In a letter dated July 27, 2007, Hemphill notified Jones–Lee's first caseworker, Shirley Burgess, that they were addressing the issues of depression, memory loss, and parental capacity, that Jones–Lee had participated in weekly counseling sessions, and that she had been referred for medication management. Hemphill further stated, "We have also discussed the fact that Ms. Jones had experienced some difficulty remembering important events. Ms. Burgess, it may be necessary to assist Ms. Jones with obtaining a physical evaluation and/or neurological evaluation to rule out medical issues."

During the first review hearing, held on July 27, 2007, the court found that Jones–Lee had "substantially complied" with the case plan and had made "some" progress toward mitigating the reasons for removal. In particular, Jones–Lee had completed parenting classes, had undergone a psychological evaluation, had exercised visitation and acted appropriately, was working part-time and had moved into an apartment, was participating in therapy, was taking medication as prescribed, and had attended the children's medical appointments. The court noted that Jones–Lee "needs to continue services and be able to demonstrate that she can provide for the juveniles' needs and keep them safe and protected."

On September 5, 2007, the court entered a temporary order prohibiting Jones–Lee and her extended family members from visiting the home of the foster parents, the children's schools, and any venue where the children were present. On September 24, 2007, before the next review hearing was conducted, Jones–Lee was incarcerat-

ed on unrelated misdemeanor charges. She remained in the Pulaski County Jail until December 19, 2007.

The next review hearing was held on December 6, 2007. In a court report filed the previous day, DHS stated that, prior to Jones–Lee's incarceration, she exercised visitation as ordered, maintained a safe environment for herself and her children, and received outpatient counseling. The court found that compliance with the case plan was "very, very slowly" proceeding toward an appropriate permanency plan for the children. The court noted that Jones–Lee did not exercise visitation with her children while incarcerated, but that she did visit them prior to incarceration. It further noted that Jones–Lee had violated its previous order by visiting one of her children at the foster parent's home.

The court also found that Jones–Lee had not received any formal mental-health outpatient treatment, although she spent five days in UAMS for "a mental-health episode." It further found that Jones–Lee was taking two of her three prescribed medications, and that she had some individual counseling prior to being incarcerated. Because Jones–Lee's voluntary drug tests were negative, the court found that she had refrained from illegal drug use. The court determined that Jones–Lee had only partially complied with the case plan and court orders and had made "only minimal progress" toward remedying the cause of removal. Jones–Lee was ordered to comply with court orders and the case plan upon her release from jail.

In a permanency-planning order entered February 22, 2008, the court changed the case goal to adoption and termination of parental rights. It found that Jones–Lee had partially complied with the case plan. It noted that each of her drug screens had been negative; that, except when she was incarcerated, she

maintained stable housing and employment; and that she exercised weekly visitation except when the children were sick or DHS was unable to facilitate the visits. Nonetheless, the court found that after being released from incarceration in December 2007, Jones–Lee missed several outpatient therapy appointments. Despite having three appointments scheduled in January and February 2008, Jones–Lee explained that she wanted to defer counseling until she completed her parenting classes and obtained a psychological evaluation. However, she had previously completed parenting classes in April 2007 and obtained a psychological evaluation in May 2007. Jones–Lee claimed that she had received consistent mental-health treatment since June 2007, that she had attended her bi-monthly medication appointments, and that she took her medications as prescribed, although she did not feel the medication helped her. The court cited Dr. DeYoub's opinion, stating that it did not believe Jones–Lee's assertion that she had been receiving the type or frequency of mental-health treatment recommended by Dr. DeYoub, as she had no supporting documentation to prove her claim. Finally, the court found that Jones–Lee had attended therapy "sporadically, episodically, and inconsistently, and that is not sufficient to warrant additional time for her to continue working toward reunification."

On February 22, 2008, DHS filed a petition to terminate Jones–Lee's parental rights on the ground that the children had been out of the home for more than twelve months and that Jones–Lee had failed to remedy the conditions that caused removal. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*) (Repl.2008). A termination hearing was scheduled for May 7, 2008.

On April 28, 2008, Jones–Lee filed a motion for a continuance because her psy-

chiatrist would be unavailable to testify at the termination hearing. She also asserted that her therapist had requested a neurological evaluation that had not been obtained. Finally, she asserted that another doctor had opined that Jones–Lee "probably" needed special services due to a genetic condition and undiagnosed mental incapacity. The court summarily denied the request for a continuance.[1]

The termination hearing proceeded as scheduled. During opening statements, Jones–Lee's counsel noted that Dr. Haroon had been subpoenaed, that she had not been released from the subpoena, and that she was out of state. Thus, counsel requested that the court leave the record open pending Dr. Haroon's testimony regarding Jones–Lee's mental state.

The first witness who testified was Hemphill, Jones–Lee's outpatient therapist. She explained that Jones–Lee attended four weekly sessions as ordered in June and July, that she did not attend therapy while incarcerated, and that she began treatment again in February 2008. Hemphill described Jones–Lee's attendance since as "sporadic." Hemphill said that during the month preceding the termination hearing, Jones–Lee attended counseling on a weekly basis, but of the forty-eight weekly sessions that could have been attended since June 2007, Jones–Lee attended only eleven. After being released from jail, she attended two sessions in February 2008 and two in April 2008. Hemphill said that she personally cancelled three or four of the missed appointments and that other sessions were canceled due to Jones–Lee's work schedule and transportation difficulties.

Hemphill explained that Jones–Lee reported in her initial sessions that she had suffered a head trauma and that she had memory loss and difficulty remembering. Thus, the initial treatment focused on addressing Jones–Lee's depression and determining whether any medical or genetic factors were precipitating her memory loss. Hemphill testified that Jones–Lee had "made some progress" because she had "developed some awareness of some of the dynamics that could've precipitated the events that have occurred" and because "she has a greater understanding of the problem with leaving the children unsupervised." Yet, she observed that Jones–Lee "still has a limited understanding of why it was wrong to leave the children alone." Hemphill concluded that Jones–Lee was not yet ready to care for her children and opined that Jones–Lee would require approximately six more months of therapy to be in a position to care for her children. She said that when Jones–Lee would be ready to do so would depend on whether she had a medical condition precipitating her memory problems. Hemphill also testified that Jones–Lee had attempted, on her own, to obtain a neurological evaluation, and that Jones–Lee would need assistance in obtaining a referral, due to her level of functioning.

1. Jones–Lee thereafter filed a motion for reconsideration, asserting that the court should have left the record open to receive Dr. Haroon's "crucial" testimony. To her motion, she attached an affidavit in which Dr. Haroon stated that she informed DHS that she wished to testify for Jones–Lee, and she requested to appear at the hearing via telephone. According to the affidavit, DHS informed Dr. Haroon that she did not need to appear in court on May 7 because the hearing would be continued. Dr. Haroon further stated in the affidavit that she told DHS that Jones–Lee could "easily have her kids back, if given the proper support" and that she was "assured that the date for the hearing was rescheduled." The circuit court summarily denied Jones–Lee's motion for reconsideration. Although Jones–Lee included that order in her second amended notice of appeal, she does not appear to appeal from the denial of her motion for reconsideration.

Dr. DeYoub also testified about his diagnosis of Jones–Lee. He opined that reunification was not an option because Jones–Lee was "too disturbed," and that gaps in treatment were the biggest cause of failure. He explained that she needed to be stabilized and on a regular medication routine, and that she needed mental-health treatment. Because he had not reviewed any of Jones–Lee's psychiatric records, Dr. DeYoub was unable to opine regarding whether her mental status was any better than when he saw her. However, he opined that if Jones–Lee had not received regular psychiatric treatment, then she had not received adequate treatment, because she needs anti-psychotic medications. He also stated that Jones–Lee would have to have made "a very significant improvement" in order for her children to be reunited with her.

The current caseworker, Danyette Pride, had been assigned to this case since December 2007. Pride testified that Jones–Lee had cooperated, that she has been available, has maintained a stable residence, has maintained employment, that she underwent the psychological evaluation, that she was taking her medications as ordered, and that she completed parenting classes. Nonetheless, Pride recommended termination based on "non-consistent counseling and lack of mental-health outpatient therapy." She explained that because Jones–Lee had not completed her mental-health therapy with Hemphill, no recommendation could be made as to whether Jones–Lee is mentally stable enough to care for her children. Pride explained that Jones–Lee was never offered in-home services to assist in developing her parental skills because she had not completed counseling. She admitted that she had not spoken to Dr. Haroon, Jones–Lee's psychiatrist, and that she did not know what Dr. Haroon recommended regarding termination. Nonetheless, based on Hemphill's testimony, Pride concluded that Jones–Lee had not yet demonstrated her ability to protect the children or that the children would be safe if they were returned to her care.

Michelle Trulsrud, the supervisor to the CASA volunteer, also testified. She recommended termination based on Jones–Lee's failure to complete therapy and the fact that she is not currently able to care for the children. Trulsrud admitted that she had not spoken to Jones–Lee's psychiatrist or to Jones–Lee.

Dr. Haroon was not present and did not testify. Her supervisor, Michael Upson, the Chief Operation Officer of Arkansas Behavioral Healthcare, brought Jones–Lee's medical records. He testified that Jones–Lee missed only one medication-management appointment, and that occurred when she was incarcerated. Upson said that Jones–Lee was diagnosed with adjustment disorder with depressed mood. Upson had difficulty reading Dr. Haroon's notes, but he did testify that Dr. Haroon noted on April 24, 2008, that "I do believe that, if trained, [sic] will be a safe mother." He could not give an estimate for a typical course of treatment but stated that with the chronically mentally ill, the treatment is usually "lifelong."

Jones–Lee testified that she requested in-home parenting services from her caseworker in February 2007, before she gave birth to C.S.J. She said that since then, she asked her attorney to request increased visitation but that her attorney did not broach the subject with the court because the attorney did not think the judge would agree. Accordingly, neither request was presented to the circuit judge.

In an order thoroughly detailing its previous findings in this case, the court terminated Jones–Lee's parental rights. The court based its decision on the grounds

asserted by DHS in its petition, that the children had lived outside of Jones–Lee's home for at least twelve months and that Jones–Lee failed to correct the conditions that caused removal. In so finding, the court stated:

> there is no dispute that the mother has only attended eight (8) therapy sessions in eleven (11) months. This is abysmal. The fact is that we are no closer today to reunification than we were at removal. She has made no progress in mitigating or eliminating the causes of removal by addressing her considerable mental-health issues. She has selective memory and can recall the names of the workers on her case, her attorneys, and dates, but she has not accepted the responsibility for her role in the removal of the children from her home. The mother still does not accept responsibility for her actions. She still has very little understanding as to when her children were removed. We do not give parents all the time in the world to achieve reunification. These children deserve permanency. These children have been out of the mother's custody for a substantial period of time, yet she has not learned anything through the course of this case. She testified that she has learned little or nothing in therapy. The mother has argued that if the Department only provided her with a neurological examination, she would be in a different position. However, this neurological examination was not important to the mother until this hearing. Furthermore, the mother had ample opportunity to bring this neurological examination to the court's attention before now. Dr. Paul DeYoub testified that there was no basis for a neurological

examination. Dr. DeYoub testified that the tests that he administered would have indicated if there was a neurological problem. Mere compliance or last minute efforts are not compelling reasons not to terminate parental rights. The mother did have a psychological evaluation. She complied with some of the recommendations but not all of them. She is not a fit and proper parent.... These children cannot wait for their mother to get into a position where she may be able to be an appropriate, mentally-stable parent some day. The children need permanency and parents who can provide for all of their needs. The mother cannot do that.

Thus, the court terminated Jones–Lee's parental rights to each of her children, and this appeal followed.[2]

### Termination

An order terminating parental rights must be based upon a finding by clear and convincing evidence that termination of a parent's rights is in the best interest of the children, considering the likelihood that the children will be adopted if the parent's rights are terminated and the potential harm caused by returning the children to the custody of the parent. Ark.Code Ann. § 9–27–341(b)(3)(A). The court must also find one of the grounds outlined in § 9–27–341(b)(3)(B). Only one ground is necessary. *Albright v. Ark. Dep't of Human Servs.*, 97 Ark.App. 277, 248 S.W.3d 498 (2007). The circuit court here terminated Jones–Lee's parental rights pursuant to the statutory ground stated in Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*):

> (i)(*a*) That a juvenile has been adjudicated by the court to be dependent-

---

2. This appeal pertains only to the rights of the mother. The respective fathers' rights to C.J., A.J., and C.S.J. were also terminated during the same proceeding. The proceeding was

continued as to the father's rights to Z.J.; the outcome of that proceeding is not part of the record.

neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct the conditions that caused removal, those conditions have not been remedied by the parent.

█ Termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Benedict v. Ark. Dep't of Human Servs.*, 96 Ark.App. 395, 242 S.W.3d 305 (2006). However, courts are not to enforce parental rights to the detriment or destruction of the health and well-being of a child. *Id.* A heavy burden is placed upon a party seeking to terminate the parental relationship, and the facts warranting termination must be proven by clear and convincing evidence. *Id.* Clear and convincing evidence is that degree of proof which will produce in the fact finder a firm conviction regarding the allegation sought to be established. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question that must be answered on appeal is whether the trial court's finding that the disputed fact was proven by clear and convincing evidence was clearly erroneous. *Williams v. Ark. Dep't of Human Servs.*, 99 Ark. App. 95, 257 S.W.3d 574 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* Such cases are reviewed de novo on appeal, but appellate courts give a high degree of deference to the circuit court, as it is in a far superior position to observe the parties before it and judge the credibility of the witnesses. *Id.*

### A. Best Interest

█ Jones–Lee does not challenge the circuit court's findings that the children are adoptable. Rather, she argues that the circuit court erred in ordering termination because it failed to consider the potential harm if the children were returned to her or, alternatively, because the evidence does not support that the children would be harmed if returned to her. She also argues that the court never specified what "clear and convincing" evidence supported its order.

Jones–Lee maintains that DHS presented no evidence regarding the current welfare of the children. She notes that while in DHS's custody, the children were separated from each other, and that Z.J. and C.J. were in four different foster homes in less than one year. She contends that any harm suffered by her children after removal from her custody was due to the instability that they experienced while in foster care. She baldly states that "[t]he evidence presented to the court showed more potential harm to the kids in the 15 months they had been out of her care than was ever proved to have occurred while they were in her care." Jones–Lee also blames DHS for not providing her in-home parenting services. Thus, she argues, that the court's conclusion that the children would be potentially harmed if returned to her care is based on speculation. As none of Jones–Lee's arguments have merit, we hold that the circuit court did not err in determining that termination was in the children's best interests.

█ First, the court summarized its previous findings and its findings based on the evidence presented at the termination hearing. Second, there is no statutory requirement that every factor considered in termination of parental rights action be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best

interest of the child. *See McFarland v. Ark. Dep't of Human Servs.*, 91 Ark.App. 323, 210 S.W.3d 143 (2005). Hence, the circuit court was not required to specifically explain which evidence supported its best-interest findings. In any event, Jones–Lee recognizes in another part of her argument that the circuit court clearly stated that her rights were being terminated due to her lack of mental stability and the failure to remedy her mental instability through consistent therapy sessions. The court expressly found that Jones–Lee had attended few therapy sessions, that she testified that she learned very little in therapy, that she does not understand why the children were removed, and that she does not accept responsibility for her actions. The evidence that Jones–Lee does not comprehend that she places her children in peril by leaving them unsupervised clearly supports a finding that the children would be subjected to potential harm if returned to her care.

In focusing on the "harm" the children have suffered while in foster care, Jones–Lee's argument is misplaced, as she fails to dispute the evidence supporting the circuit court's potential-harm finding. Moreover, Jones–Lee cannot create the condition that caused her children to be placed in foster care and then argue that the instability of the foster-care system precludes the circuit court from finding that returning her children to her poses greater potential harm than having the children remain in the foster-care system. Foster care is not meant to be a stable, long-term solution, which is precisely why parents are given limited time to comply with the case plan, and why reunification must be achieved within a reasonable time, from the children's perspective. *See* Ark.Code Ann. § 9–27–341(a)(3). Moreover, in this case, other than pointing to the fact that some of her children were placed in multiple foster homes, Jones–Lee cites to no other proof of the "harm" that has come to her children as a result of being placed in foster care. In fact, the court reports and court orders indicate the contrary.

On these facts, we hold that the circuit court did not err in finding that termination was in the children's best interest, considering the likely potential harm in returning them to Jones–Lee's custody.

## B. Failure to Remedy the Conditions that Caused Removal

We consider Jones–Lee's third argument next: that the circuit court erred in finding that she failed to remedy the conditions that caused removal. *See* Ark. Code Ann. § 9–27–341(b)(3)(B)(i)(*a*). Jones–Lee concedes that she did not prove "consistency in her therapy sessions" but contends that she otherwise complied with every aspect of the case plan. She maintains that her missed therapy sessions were not due to apathy toward her treatment but were caused by conflicts in her schedule due to work, transportation problems, and cancellations by her therapist. Jones–Lee also argues that the court failed to consider her recent improvements, and that it disregarded the ways in which she complied with the case plan. Finally, she argues that permanency could still be achieved within a reasonable amount of time.

Again, Jones–Lee fails to persuade. Jones–Lee does not challenge the circuit court's finding that she attended only eight therapy sessions in eleven months. As the sessions were weekly sessions, Jones–Lee should have attended at least forty sessions. She attended four weekly sessions in June/July 2007. As Jones–Lee was incarcerated from September 24, 2007, until December 19, 2007, she attended no further sessions with Hemphill that year. Thus, Jones–Lee attended only four out

of what should have been sixteen sessions prior to being incarcerated. Jones–Lee testified that she received "general" counseling while incarcerated, but she offered no written proof to support that she received counseling while in jail. Upon release, she did not again attend counseling with Hemphill until February 2008. She attended two sessions in February, none in March, and two in April. Hemphill attributed only three or four missed sessions to her own cancellations.

While the court cited the number of Jones–Lee's missed counseling sessions and termed her lack of attendance "abysmal," the court was not playing a "numbers game." It is apparent that the court did not terminate Jones–Lee's parental rights based solely on the fact that she missed counseling sessions. Significantly, the court also relied on Jones–Lee's failure to learn anything from the sessions that she did attend. Jones–Lee has not progressed to the point where she comprehends that young children should not be unsupervised; nor has she accepted responsibility for leaving the children alone.

■ Therefore, the court concluded that "we are no closer today to reunification than we were at removal." That is, despite complying with the remainder of her case plan, Jones–Lee is not yet a fit parent, and her unfitness is due precisely to her failure to comply with the counseling portion of her plan. Partial compliance with, or even completing the case plan, does not preclude termination. What matters is whether a parent's compliance with or completion of the case plan achieved the intended result of making her capable of caring for her child. *See Ullom v. Ark. Dep't of Human Servs.*, 340 Ark. 615, 12 S.W.3d 204 (2000). Here, the portion of the case plan with which Jones–Lee complied did not resolve her mental-health problems. As Dr. DeYoub opined, that

will require adequate mental-health counseling, at a minimum.

It is true that both Hemphill and Jones–Lee's psychiatrist felt that, with continued treatment, Jones–Lee could become stable enough to regain custody of her children. Hemphill estimated that would take six months. While arguing that she was prevented from presenting evidence of her current mental state and recent improvements, Jones–Lee fails to explain why she could not have deposed her psychiatrist, since she knew the psychiatrist would not be available to testify at the termination hearing.

Jones–Lee would have us reverse on the hope that she would consistently attend counseling, would benefit from it when she did not before, and would be ready to regain custody of her children when she had not exercised unsupervised visitation. She was warned in the permanency-planning order entered on February 22, 2008, that her sporadic counseling attendance was insufficient to prevent the case goal from being changed to termination. Yet, afterward, she attended only two more sessions over the next two months.

Had Jones–Lee diligently attended counseling, an additional six months may have been reasonable. But to permit her more time on the facts in this record is to hope against hope; to deny her more time on the facts in record is not clearly erroneous. Accordingly, we hold that the circuit court did not err in determining that Jones–Lee failed to remedy the conditions that caused her children's removal from her custody. *See Jefferson v. Ark. Dep't of Human Servs.*, 356 Ark. 647, 158 S.W.3d 129 (2004) (affirming a termination order, in part, because the mother failed to regularly attend therapy sessions, and where the mother was not sufficiently emotionally or mentally stable to have her child returned to her custody, and stating that it

was best for the child to have a safe, permanent home, where she could be assured of continuity and stability).

### C. Meaningful Efforts

■ Jones–Lee also argues that the circuit court erred in finding that DHS made a meaningful effort to rehabilitate the home and to correct the conditions that caused removal. In support of this argument, Jones–Lee points to two services that were not provided to her: the neurological evaluation recommended by her counselor and in-home parenting services.

Section 9–27–341(b)(3)(b)(i)(*a*) requires DHS to prove, among other things, that it made a meaningful effort to rehabilitate the parent and to correct the conditions that caused removal. During the termination hearing, Jones–Lee's counsel elicited testimony regarding the neurological-evaluation recommendation and DHS's failure to provide in-home parenting services. She then argued the point during closing argument.

■ The fatal problem for Jones–Lee is that she did not appeal from any of the final, appealable adjudication or review orders in which the circuit court determined that DHS had made meaningful efforts toward reunification. *See* Ark. R.App. P.-Civ. 2(c)(3). At no point prior to the termination hearing did Jones–Lee challenge the appropriateness of the reunification services offered, or not offered, by DHS. Her failure to challenge the court's prior "meaningful-efforts" findings precludes this court from now reviewing any adverse rulings resulting from those orders not appealed from. *See Lewis v. Ark. Dep't of Human Servs.*, 364 Ark. 243, 217 S.W.3d 788 (2005).

Jones–Lee's argument also fails on the merits. As to the neurological evaluation, Hemphill informed DHS on July 26, 2007, that it "may be necessary to assist Ms. Jones with obtaining a physical evaluation and/or neurological evaluation to rule out medical issues." Hemphill testified that the issue arose because Jones–Lee reported having suffered a head trauma and having memory loss. However, despite the two full hearings that were held after that recommendation was made, Jones–Lee never brought the issue to the court's attention until the termination hearing. As the circuit court determined, the neurological evaluation was apparently not important to Jones–Lee until the termination hearing.

Moreover, the court relied on Dr. DeYoub's testimony that, according to his tests, there was no basis for a neurological examination. He testified that the tests that he administered would have indicated if a neurological problem existed. Additionally, the court was not convinced that Jones–Lee had memory problems. It found, instead, that her memory was selective—in other words, she was able to remember what she wanted to remember, such as her caseworkers' names, her attorneys, and dates.

In short, the circuit court was faced with the conflicting evidence that psychiatric testing revealed no need for a neurological evaluation, versus Jones–Lee's assertion, devoid of any medical evidence, that she needed such an evaluation, and her counselor's suggestion that she "may" need assistance in obtaining such an evaluation. It was within the circuit's court's discretion to determine on the conflicting evidence whether Jones–Lee needed a neurological evaluation. See *Lewis, supra.*

The court here made no specific finding regarding DHS's failure to provide in-home parenting services. The caseworker explained that in-home parenting services are provided when a parent "completes" individual counseling. However, the fact

that Jones–Lee did not "complete" therapy cannot be dispositive because counseling may be necessary even after the children are returned to a parent's care. What is dispositive is the fact that Jones–Lee missed so many therapy sessions that she never progressed to the point where it seemed productive to offer in-home parenting services. Thus, the circuit court's findings that Jones–Lee failed to attend therapy sessions and failed to learn anything from those sessions support DHS's decision not to offer in-home parenting services.

On these facts, the circuit court did not err in finding that DHS made meaningful efforts to rehabilitate the home and correct the conditions that caused removal; therefore, we affirm the termination order.

### Motion for Continuance

Jones–Lee's final argument is that the circuit court erred in denying her motion for a continuance because the denial precluded her from presenting evidence supporting that termination was not necessary. A trial court shall grant a motion for continuance only upon a showing of good cause and only for so long as is necessary. *See Smith v. Ark. Dep't of Human Servs.*, 93 Ark.App. 395, 219 S.W.3d 705 (2005). The granting or denial of a motion for continuance is within the sound discretion of the trial court, and that court's decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *Id.* When deciding whether a continuance should be granted, the circuit court should consider the following factors: (1) the diligence of the movant; (2) the probable effect of the testimony at trial; (3) the likelihood of procuring the witness's attendance in the event of postponement; and (4) the filing of an affidavit, stating not only what facts the witness would prove, but also that the appellant

believes them to be true. *Id.* Additionally, the appellant must show prejudice from the denial of a motion for continuance. *Id.* We hold that the circuit court in this case did not abuse its discretion in denying Jones–Lee's motion for a continuance.

Here, DHS—not Jones–Lee—subpoenaed Jones–Lee's psychiatrist, Dr. Haroon, to appear at the termination hearing. On April 28, 2008, ten days before the hearing, Jones–Lee filed a motion for continuance on two grounds: that Dr. Haroon would be unable to attend the termination hearing because she would be out of state and because Jones–Lee had not received a neurological evaluation. Jones–Lee alleged that Dr. Haroon opined "that Defendant is probably in need of special services, as a result of a genetic condition and undiagnosed mental incapacity." Jones–Lee urged that the case should not proceed to termination until "a full evaluation and adequate services" were provided to her.

Jones–Lee attached the July 26, 2007 letter from her counselor, Hemphill, in which Hemphill stated that it "may be necessary to assist" Jones–Lee in obtaining physical evaluation and/or neurological evaluation to rule out medical issues. However, Jones–Lee did not attach an affidavit from Dr. Haroon, stating what facts she would prove to be true, as required by Ark.Code Ann. § 16–63–402(a) (Repl.2005).

The circuit court summarily denied Jones–Lee's motion. At the beginning of the termination hearing Jones–Lee asserted that Dr. Haroon had not been released from her subpoena and requested that the court keep the record open pending the doctor's testimony concerning Jones–Lee's mental state. The court made no ruling at that time. Later in the proceedings, the court continued the termination issue as to Z.J.'s father because he had no attorney. The court noted, "we've still got it on the

table possibly as having Dr. Haroon come back anyway.... If I put it off for Dr. Haroon to testify, we're beyond the ninety days because the ninety days runs this month."[3] The court stated that the continuance for Z.J.'s father would occur regardless of its ruling on Jones–Lee's request. At the end of the hearing, the court denied the request to keep the record open, stating, "time is of the essence and we need to do it. And we've got time on the docket and [I] don't want to continue just because one witness can't come."

Jones–Lee now argues that the denial of her motion for a continuance robbed her of the opportunity to present evidence of her current mental state by the "only expert witness familiar with Jones–Lee and her current mental status." That is not so. Jones–Lee's counselor concluded that Jones–Lee would not be ready to be reunited with her children for six months. While Dr. DeYoub could not directly testify as to Jones–Lee's current mental state, he testified that Jones–Lee would have to have made "a very significant improvement" in order for her children to be reunited with her.

Jones–Lee is correct that she was not permitted to have Dr. Haroon testify that she could become a fit parent with proper training. However, through Upson, Jones–Lee was able to admit Dr. Haroon's opinion that, "if trained" Jones–Lee would be a "safe mother." That, itself, was *additional* evidence of Jones–Lee's current mental status, showing that she is *not currently* a "safe mother." Thus, in some respects, Dr. Haroon's testimony would have been cumulative to Hemphill's testimony, and would not have been the *only* testimony concerning Jones–Lee's current mental state.

Additionally, the circuit court did not err because Jones–Lee was not diligent in seeking Dr. Haroon's testimony. First, *she* could have subpoenaed Dr. Haroon, instead of waiting for DHS to do so, thus giving her more control over her own witness. Second, upon learning that Dr. Haroon would be out of town, Jones–Lee could have deposed the doctor. Third, Jones–Lee did not attach an affidavit from Dr. Haroon to the motion for a continuance, explaining what evidence she would prove to be true. *See* Ark.Code Ann. § 16–63–402(a). Moreover, Jones–Lee's motion merely stated that Dr. Haroon believed that Jones–Lee needed special services; it did not state that the rendering of those services would enable Jones–Lee to become a fit parent within a reasonable time from the children's perspective. Significantly, Jones–Lee ignores that any dearth of evidence concerning her current mental status was due, in no small part, to the fact that she did not consistently attend her counseling sessions with Hemphill and that she waited nearly one year to request a neurological evaluation.

Given that Jones–Lee was not diligent in securing the testimony that she claimed was crucial, and given that the testimony "denied" was not the only testimony regarding Jones–Lee's current mental state or her current fitness as a mother, the circuit court did not abuse its discretion when it denied Jones–Lee's motion for a continuance.

Affirmed.

VAUGHT, C.J., PITTMAN, GRUBER, and HENRY, JJ., agree.

HART, GLADWIN, ROBBINS, and BAKER, JJ., dissent.

---

**3.** Administrative Order Number 3 requires circuit courts to submit quarterly report cases that have been pending more than ninety days after submission.

HART, J., dissenting.

The circuit court "shall conduct and Complete a termination of parental rights hearing within ninety (90) days from the date the petition for termination of parental rights is filed unless continued for good cause...." Ark.Code Ann. § 9–27–341(d) (Repl.2008). On review of a denial of a continuance, we consider whether the circuit court abused its discretion. *Rhine v. Ark. Dep't of Human Servs.*, 101 Ark. App. 370, 278 S.W.3d 118 (2008). Here, Eurana Jones–Lee established good cause to briefly hold the record open for critical evidence regarding whether her children could be returned to her. The circuit court simply placed more emphasis on quickly completing the termination of Jones–Lee's parental rights than on hearing relevant testimony, and it did so despite Jones–Lee's diligent efforts to secure the critical evidence. Thus, the circuit court abused its discretion by denying the request, and I respectfully dissent from the majority's affirmance.

On appeal, Jones–Lee argues that she showed good cause for a continuance. On April 28, 2008, she filed a motion for a continuance, stating that her psychiatrist, Dr. Shamshad Haroon, would be out of state on the date of the hearing and unable to attend the termination hearing. The court denied the motion on May 5, 2008. During opening statements at the May 7, 2008 termination hearing, Jones–Lee's counsel noted that Dr. Haroon had been subpoenaed for the hearing but was out of state. Counsel requested that the court leave the record open pending Dr. Haroon's testimony regarding Jones–Lee's mental state. The court made no ruling at that time.

During the hearing, DHS presented the testimony of Fritzie Hemphill, Jones–Lee's outpatient therapist, who testified that while Jones–Lee had made some progress, she was not yet ready to care for her children and would require approximately six months in therapy to be in a position to care for her children. DHS also presented the testimony of Dr. Paul DeYoub, a forensic psychologist who evaluated Jones–Lee one time, one year earlier, on May 7, 2007. At the time of the evaluation, Dr. DeYoub felt that Jones–Lee was "too disturbed" for reunification. Dr. DeYoub described Jones–Lee's condition on the date that he examined her as "terrible shape, very deteriorated." Dr. DeYoub testified, however, that without seeing her again, he could not opine whether her mental status was any better now than when he saw her one year earlier.

Following their testimony, the court granted a continuance to the father of one of the children. The court also noted that "we've still got it on the table possibly as having Dr. Haroon come back." The court, however, noted that if "I put it off for Dr. Haroon to come testify, we're beyond the ninety days, because the ninety days runs this month." Counsel for DHS noted that it had subpoenaed Dr. Haroon and was prepared to complete the hearing without Dr. Haroon being present. The court concluded that "we're going to proceed and not waste any more time arguing the same thing."

Dr. Haroon was not present and did not testify. Her supervisor, Michael Upson, the Chief Operation Officer of Arkansas Behavioral Healthcare, brought Jones–Lee's medical records. Upson had difficulty reading Dr. Haroon's notes, but he did testify that Dr. Haroon noted on April 24, 2008, that "I do believe that, if trained, [sic] will be a safe mother." At the conclusion of the hearing, the court stated,

> I said there was a possibility of Dr. Haroon—I certainly have made that decision, but didn't want to make it ahead of time and certainly, since that was a

request of [Jones–Lee]. But I denied the motion, because time is of the essence and we need to do it. And we've got time on the docket and don't want to continue just because one witness can't come.

The court terminated Jones–Lee's parental rights. In an order filed May 22, 2008, the court found that the children had been adjudicated dependent-neglected and had continued out of the custody of Jones–Lee for twelve months and that despite a meaningful effort by DHS to rehabilitate her and correct the conditions that caused the removal, the conditions had not been remedied by her. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(*a*). In so finding, the court stated that Jones–Lee had "made no progress in mitigating or eliminating the causes of removal by addressing her considerable mental health issues."

Jones–Lee thereafter filed a motion for reconsideration, asserting that the court should reopen the record to receive Dr. Haroon's testimony on her stability and compliance with medical and mental-health treatment. Jones–Lee attached to her motion an affidavit in which Dr. Haroon stated that she had been subpoenaed to attend the hearing; that she informed DHS's attorney that she would be out of state on that date; that she told DHS's attorney she wanted to testify and asked if she could appear by telephone; that DHS's attorney told her she did not need to appear because the hearing would be continued; that she told DHS's attorney that Jones–Lee could "easily have her kids back, if given the proper support"; and that she was assured that the date for the hearing would be rescheduled. The circuit court denied her motion for reconsideration.

On appeal, Jones–Lee argues that the court denied her request to hold the record open to hear Dr. Haroon's testimony regarding her mental stability, even though the court's decision to terminate her parental rights focused on her mental-health stability. In sum, Jones–Lee requested that the record be held open to hear Dr. Haroon's testimony on her mental state, and the circuit court essentially concluded that good cause was not shown for the extension of the hearing beyond the ninety-day period. But despite this ruling, the court's decision to terminate Jones–Lee's parental rights was based on its conclusion that she had not addressed her mental-health issues.

The record shows that Jones–Lee was seen by Dr. Haroon, a psychiatrist, on April 24, 2008, just days before the termination hearing. Upson testified that Dr. Haroon wrote that, with training, Jones–Lee would be a safe mother. Dr. Haroon's post-hearing affidavit also noted that she could easily have her kids back if given the proper support. In contrast, DHS presented the testimony of Dr. DeYoub, who, having seen Jones–Lee one year earlier, was unable to opine as to her current mental state, and Hemphill, a therapist, who opined that Jones–Lee would be capable of caring for her children in approximately six months. The court precluded Jones–Lee from producing testimony that would have most directly addressed the question of her mental health—the testimony of Jones–Lee's psychiatrist—and yet made its decision to terminate her parental rights based on mental-health issues. Also, despite the court's desire to conclude the case before the ninety-day period was up, it nevertheless continued the hearing for the father of one of the children. Given this, one must conclude that the court abused its discretion by denying the request to hold the record open for Dr. Haroon's testimony. See *Rhine*, supra (holding that the circuit court abused its

discretion in refusing to grant a continuance beyond the ninety-day limit).

It is apparent that the circuit court placed more emphasis on terminating Jones–Lee's parental rights prior to the expiration of the ninety-day limit than on hearing relevant evidence. One panel of this court recently wrestled with the balance between speedy resolution of termination hearings and the necessity of hearing critical evidence. See Prows v. Ark. Dep't of Health and Human Servs., 102 Ark.App. 205, 283 S.W.3d 637 (2008). In Prows, the mother suffered from mental instability, but even though she was not yet ready to have sole custody of the child, it was established that her mental state had recently improved. The circuit court terminated the mother's parental rights because of her mental instability and her failure to remedy that condition. The circuit court further stated that it had to terminate the mother's parental rights if the child was not immediately able to go home with the mother. The Prows court reversed, holding that the circuit court should have considered and weighed evidence about the mother's recent improvements. In analyzing whether the error was harmless, the court noted that there was no statutory requirement that the child must be immediately able to return to the mother. It cited the statutory provision that the intent of the termination statute is to "provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective." Ark.Code Ann. § 9–27–341(a)(3). It concluded that this statutory provision "seeks stability for the child, while allowing a parent a reasonable time (all material things considered) to correct

problems." 102 Ark.App. at 209, 283 S.W.3d at 640. The Prows court concluded that, given the instability in the child's life in foster care and the circuit court's incorrect statement of the law, the mother's recent mental stability could well affect the court's ultimate decision.

Similarly, the circuit court in the case at bar, rather than emphasizing the ninety-day limit, should have likewise considered relevant positive evidence on Jones–Lee's mental stability and determined whether her children could be returned to her within a reasonable period of time. Instead, the circuit court not only did not consider and weigh the evidence, it placed great weight on the ninety-day limit and precluded Jones–Lee from even presenting the evidence, despite terminating her parental rights based on mental-health issues. Moreover, it cannot be said that her children's lives are currently stable (the children are not together, and two of the children were in four different foster homes in less than one year). Thus, Prows supports the conclusion that the circuit court abused its discretion in not holding the record open for the taking of Dr. Haroon's testimony on this critical issue.

The majority concludes that Jones–Lee was not diligent because she did not subpoena Dr. Haroon or depose her. This is not the standard for diligence, and the majority cites no authority for such a proposed standard. This was no last-minute effort by Jones–Lee to secure Dr. Haroon's testimony at the hearing. DHS had in fact subpoenaed Dr. Haroon, and after learning that Dr. Haroon would be out of state, Jones–Lee sought a continuance nine days prior to the hearing for that reason. Moreover, Jones–Lee also asked for a continuance at the beginning of trial, during trial, and after trial, and the court was fully apprised of the need to hear Dr.

Haroon's testimony on her mental-health issues. Surely, this denotes diligence. The majority also notes that denial was proper because appellant failed to file an affidavit to support her motion. The Arkansas Supreme Court, however, stated in *Stenhouse v. State*, 362 Ark. 480, 209 S.W.3d 352 (2005), that to raise this argument, the State, who was the appellee, must object before the circuit court that an appellant failed to file the affidavit. DHS, who was the appellee, also did not do so.

Further, the majority suggests that the error was harmless because Hemphill testified that Jones–Lee would require additional therapy. This ignores the fact that Dr. Haroon is the only psychiatrist who treated Jones–Lee, and that the psychologist, Dr. DeYoub, knew nothing about her current mental state. The majority also suggests that it was harmless because we have Dr. Haroon's notes, and those notes suggest that she is not currently a safe mother. This assertion, however, obfuscates the fact that Dr. Haroon's conclusion was that Jones–Lee could be a safe mother. The circuit court should have heard the testimony to determine whether that would occur within a reasonable time.

This case should be remanded so that the circuit court may hear Dr. Haroon's testimony and then determine whether termination of parental rights is warranted.

GLADWIN, ROBBINS, and BAKER, JJ., join.