2010 Ark. App. 739

**Kathryn EDWARDS, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES & Minor Child, Appellees.**

**No. CA 10–556.**

Court of Appeals of Arkansas.

Nov. 3, 2010.

Deborah Ruth Sallings, Little Rock, for appellant.

Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, Tabitha Baertels McNulty, Little Rock, for appellee.

DAVID M. GLOVER, Judge.

Appellant, Kathryn Edwards, appeals from the termination of her parental rights to her daughter, EE (DOB August 29, 2006).[1] She contends that the trial court erred in terminating her rights because there was insufficient evidence that termination was in the child's best interests, and there was insufficient evidence that appellee, Arkansas Department of Human Services, made a meaningful effort to assist her in reunification. We affirm.

### Standard of Review

We review termination of parental rights cases de novo. *Grant v. Arkan-*

---

1. The parental rights of the father, Danny Edwards, were also terminated, but he has not appealed the termination.

sas *Dep't of Human Servs.*, 2010 Ark. App. 636, 378 S.W.3d 227. The grounds for termination of parental rights must be proven by clear and convincing evidence. *Id.* When the burden of proving a disputed fact is by clear and convincing evidence, the question on appeal is whether the circuit court's finding that the disputed fact was proven by clear and convincing evidence is clearly erroneous, giving due regard to the opportunity of the circuit court to judge the credibility of the witnesses. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* A heavy burden is placed on the party seeking termination. *Id.* This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents. *Id.* Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Id.* Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children. *Id.*

*Testimony from termination hearing*

Lacey Maybee, a DHS family-service worker, testified that EE was brought into DHS care in June 2008 because appellant was intoxicated and unable to care for the child; that the services offered to appellant were medical services, Schmieding evaluation, drug and alcohol assessment, counseling, psychological evaluation, inpatient treatment, transportation, multiple staffings, and parenting classes. She testified that appellant completed her drug and alcohol assessment, which recommended inpatient treatment; that appellant completed inpatient counseling, with a release date of February 3, 2009; that attending counseling and AA meetings were a required part of the case plan; that unsupervised and overnight visits were allowed after February 2009 but were discontinued when DHS received an anonymous tip that appellant was drinking. Maybee also stated that EE was being returned from these visits "unclean, sick."

Maybee testified that, in the visits she had supervised, appellant did not display a grasp of parenting skills. For example, appellant allowed EE, a three-year-old child, to have adult-sized scissors and, when cautioned by Maybee, appellant told her that EE had been using those scissors all of her life and that she knew how to use them. When appellant tried to take the scissors away, EE became very upset and swung them wildly above her head.

Maybee further explained that appellant did not discipline EE appropriately during visitation and that she often displayed indifference to EE during visitations, answering phone calls, texting, and painting her nails. Maybee expressed her opinion that proper parenting had been a concern for DHS from the time EE was taken into custody. She said that appellant had been given parenting instructions, but that her parenting skills had not improved, explaining that "her parenting has become so negligent that it's dangerous at this point," *e.g.*, "not paying attention to her child, allowing her to climb on chairs and tables, playing with scissors." She also explained that appellant had not provided any *verifiable* proof of employment, and she expressed concerns about the legitimacy of the sign-in sheets that appellant provided from the AA meetings, which she was supposed to attend as part of her case plan.

Maybee testified that appellant failed to provide proof of counseling attendance until after the permanency-planning hearing in August 2009. She said that appellant had enrolled in a beauty college, which

she started in October of last year, but that she did not graduate. However, Maybee acknowledged that appellant had appropriate housing and had lived in the same apartment complex for the duration of the case.

Maybee explained that appellant had earlier been offered similar services in Louisiana; a letter from the Louisiana department expressed concerns about appellant leaving EE with the babysitter for extended periods of time, alcohol use, a positive test for marijuana, and an unstable residence, all of which was happening in October 2007—shortly before EE came into ADHS care. Another document from Louisiana that was part of appellant's case file indicated that appellant was not cooperative with the services offered to her.

Maybee acknowledged that when it was discovered that appellant had wine bottles in her apartment during the summer of 2009 and was told that it was not a good idea for a recovering alcoholic to have wine in her house, she removed the bottles and also denied having drunk from them. Maybee explained that during a visit to Maybee's office after the discovery of the wine bottles, appellant said that she might have wine when she goes out to eat. Maybee told her she could not have alcohol at all.

Maybee acknowledged that appellant had completed the required parenting classes and that no additional classes were ordered or provided. She explained, however, that social-service aides were present during visitations and that they were there to intervene and show correct parenting skills.

Upon questioning by the attorney ad litem, Maybee stated that appellant saw Samaritan House counselor Nancy Wells until October 2009; when Maybee became aware in December 2009 that appellant was not attending counseling, she obtained a referral for appellant to see Kathleen Housley. Although Maybee expressed concerns about whether appellant actually attended substance-abuse counseling at Samaritan House, as she claimed, Maybee acknowledged that appellant was given three random alcohol tests, which were all negative.

Maybee said that she was constantly talking to appellant about what she needed to do concerning the case-plan goals, and that the SSAs who supervised appellant's visitation, in effect, provided her with one-on-one parenting coaching during the visits. She further explained that appellant did not seem to take the parenting advice offered to her very seriously; that her response to EE throwing things, yelling, hitting, and biting her mother would be comments such as "you're so cute," rather than redirecting her and explaining why the behavior was not appropriate. She said that appellant would tell EE, "you're so sexy," and put makeup on her and paint her skin with fingernail polish; that one time she undressed EE and had her slip into a cut-off pants leg, presumably to serve as a skirt; that it was too tight and EE expressed discomfort and appellant just told her she would get used to it.

Maybee testified that DHS's recommendation was to terminate appellant's parental rights; that the termination recommendation was based on the fact that DHS had seen no progress in appellant's parenting abilities, that she had never taken responsibility for EE being in DHS custody, and that she had never acknowledged having a problem with substance abuse. Maybee stated that she would be concerned about EE's health and safety if she were returned to appellant. It was her opinion that the department had made meaningful efforts to rehabilitate appellant.

Maybee explained that EE had been in foster care continually since the case opened; that a trial placement was never accomplished; and that the short period of unsupervised and overnight visitation had to be stopped. She said that EE was currently in a foster home; that she was three years old, had no medical issues, and no real psychological issues; and that she was "certainly an adoptable child." She said that potential adoptive parents had been identified and that it would be in EE's best interest for appellant's parental rights to be terminated.

Betty Goff, a DHS social-service aide, testified that she was familiar with the case because she had helped supervise visits for a year and a half; that she teaches one-on-one parenting; that in her observations of appellant and EE she did not think appellant demonstrated the type of parenting that is taught in parenting classes; that she often had to redirect appellant over things like allowing EE to use sharp scissors and jumping up and down on a table; and that appellant did not believe such redirection or placing EE in time out was necessary.

Kathleen Housley, a licensed professional counselor and licensed alcoholism and drug-abuse counselor, acknowledged that her history with appellant had been very brief, testifying that she started individual counseling with appellant "last week."

Ryan McClain, sales manager for the Atlanta Cattle Exchange, testified that appellant is an independent-contractor salesperson for the cattle exchange; that the exchange just supplies contractors with the product; and that they go out and make their own money.

Ginger Katt, EE's foster mother, testified that she has had EE since December 2008, and that EE was "doing pretty good, considering." She said that she has trouble with EE after her visits with appellant because EE seems to forget the rules and does things that she does not ordinarily do.

Appellant moved for a directed verdict, which was denied. In presenting her case, appellant testified that she lives in a two-bedroom apartment; that she is current on her rent and utilities; and that she is employed at the Atlanta Cattle Exchange. She explained that she has other job prospects and that she hopes to get a job with a "finance corporation" where her job duties would be "gathering clients and meeting with people and selling them life plans, financial plans, and meeting with people to help them better their credit and provide them with home and auto and life insurance options" but that it, too, would be commission work.

She explained that she was supposed to do certain things pursuant to the case plan; that she had completed the inpatient treatment; that she had done the drug and alcohol assessment; that she had provided documentation of her attendance at AA/NA meetings; that regarding the counseling that she was ordered to complete, she provided documentation of her counseling at Samaritan House; that she decided to tell Ms. Maybee that she needed to change counselors because she had missed so many visits; that Nancy Wells "got upset because I missed three, maybe four visits with her"; that Ms. Wells stopped seeing her; and that she spoke to Maybee about setting up counseling and Maybee made a referral for her. She said that the referral was to Kathleen Housley and that she had seen her twice.

Appellant stated that she was also ordered to complete parenting classes; that she attended twelve hours at the beginning of her case in 2008; and that she had not had any other parenting classes.

Appellant testified that she has attempted to abstain from alcohol during the pendency of the case; that she never tested positive on any of the random alcohol tests; that she thinks she has an issue with alcohol; that it's something she's trying to beat; that she has an AA sponsor, Janet, and that she talks to her regularly; that her parents help her financially if she needs it and have the means to do so; and that she takes things to EE when she goes to visit.

She said that she got an AA sponsor about three weeks after the last court hearing; that she had not gotten one before that because she did not like anybody enough; and that she had also been in inpatient substance-abuse treatment when she was between the ages of fourteen and sixteen.

She acknowledged that during her visitation with EE more than one worker told her that her clothing was not appropriate; that she was told not to draw on EE but did so anyway; that she was told about the inappropriateness of sharp scissors more than once but gave them to EE again; that it was a lie to say that she had admitted having a glass of wine with dinner; that she did not drink after her inpatient treatment; that she had a solid lead on a financial job; that she had gotten a confirmation code on the internet for the financial job; that she had completed grades ten and eleven in school; and that she got her GED. She said she went to Currie Academy of Hair Design, a trade school, where she had gotten three write-ups in one day and had upset some people and made them cry. She stated that the writeups were for verbally assaulting someone and for cheating; that she felt forced to quit; that as to whether it was her fault, she felt it was a mutual agreement to quit.

Appellant acknowledged that she had talked on her phone and "texted a couple of times" during visitation; that she had only watched movies two or three times, and that was before she was told she wasn't supposed to do that; that she sometimes flipped through a magazine while EE was coloring or watching TV; and that her dad had told her during visits that she needed to pay more attention to EE, but that was "because he knows how DHS is."

Appellant acknowledged that the babysitter she stated she planned to use in reintegrating EE into her life had been removed from her home by the State of Arkansas and that her neighbor, Janet, had signed the AA attendance sheets that she had provided to DHS for the last eight meetings. She stated that she went to the AA meetings; that the reason she had her friend and neighbor sign was "because we went together"; and that she did not have the chairperson sign because "there was never a specific chairperson."

Dale Chapman testified that appellant was his adopted daughter; that he was EE's grandfather; that he and his wife tried to attend visits with appellant and EE; that appellant loved EE but he realized she was not a perfect parent; and that he had corrected her during visits but that he believed appellant and EE had a strong bond.

*Termination requirements*

The termination of parental rights must be based upon a finding by clear and convincing evidence that termination is in the best interest of the child, considering the likelihood of adoption and the potential harm caused by returning the child to parental custody. Ark.Code Ann. § 9–27–341(b)(3)(A) (Repl.2009). In addition, the trial court must find one of the statutory grounds set forth in section 9–27–341(b)(3)(B), and a finding of one statutory

ground is sufficient. *Jones–Lee v. Arkansas Dep't of Human Servs.*, 2009 Ark. App. 160, 316 S.W.3d 261 (2009).

Here, the trial court found that termination was in the child's best interest and that, despite meaningful efforts by DHS to reunify the family, appellant had failed to remedy the conditions that had brought the child into DHS care approximately seventeen months earlier. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a). The trial court's specific findings included the following:

a. That the juvenile was adjudicated dependent neglected by this Court on August 5, 2008, and has been in the custody of the Department since June 15, 2008, a period of approximately seventeen (17) months as of the date of this hearing on January 21, 2010;

b. That the parents, Kathryn and Danny Edwards, have failed to remedy the conditions that caused removal despite the meaningful effort by the Department to rehabilitate them through offering the following services:

   (1) medical services;

   (2) transportation assistance and referrals;

   (3) visitations;

   (4) referrals and payment for counseling services;

   (5) referrals and payment for substance abuse evaluation;

   (6) referrals and payment for inpatient substance abuse rehabilitation;

   (7) parenting classes;

   (8) worker visits;

   (9) Schmieding evaluation and follow ups.

c. That Kathryn Edwards, despite completing parenting classes has not demonstrated that she has learned or can apply those skills to appropriately parent the juvenile, [EE];

d. That Kathryn Edwards continues to act in a manner that creates strife and instability in her life, which creates a risk to the development of the juvenile, [EE], as evidenced by the testimony of Kathryn Edwards, who testified that she had recently been forced to withdraw from a beautician certification course due to a verbal altercation with another classmate;

e. That Kathryn Edwards continues to act inappropriately toward [EE] during visitations, including providing [EE] with inappropriate clothing, as evidenced by a cut-out pant leg that she dressed [EE] in as a skirt, despite the child's protestations that the item was too tight;

f. That Kathryn Edwards has continued to demonstrate a lack of parenting skills toward the juvenile, [EE], as evidenced by the testimony of her father, who testified that as recently as one week ago, he had to admonish her to pay attention to her daughter, [EE], during a scheduled visitation;

g. That Kathryn Edwards has failed to participate meaningfully in the case plan; and has attempted to mislead the Department and Court, as evidenced by her testimony regarding her AA/NA attendance sheets, which she admitted to forging;

h. That Danny Edwards has failed to appear at this hearing despite proper service and notice;

i. The Court finds that [EE] is adoptable based on age, disposition, and testimony by worker Lacey Maybee that [EE] is currently placed in a

home that has expressed a willingness and desire to adopt.

Appellant's sole point of appeal actually involves two parts: 1) there was insufficient evidence that the termination was in the child's best interest; 2) there was insufficient evidence that DHS made a meaningful effort to assist appellant in reunification.

### 1) Child's best interests

In the first portion of appellant's argument under this subpoint, she contends that "in neither the TPR order nor the judge's remarks in announcing his decision is there a finding that TPR had been proved by clear and convincing evidence to be in E.E.'s best interest, as the TPR statute requires...." We disagree.

■ Paragraph 4 of the court's order provides in part: "The Court finds that *pursuant to the requirements of A.C.A. § 9–27–341* it is contrary to the child's best interests, health and safety, and welfare to return to the parental care and custody of their parents...." (Emphasis added.) Section 9–27–341(b)(3) requires that "[a]n order forever terminating parental rights shall be based upon a *finding by clear and convincing evidence: That it is in the best interest of the juvenile,* including consideration of the following factors: [likelihood of adoption and potential harm from continued contact]." Appellant cites no authority that more precision is required than what was provided by the trial court in its order, and we are not otherwise convinced that this portion of her argument has merit.

■ The second portion of appellant's argument under this subpoint contends that the evidence itself does not support a "best interests" finding. She acknowledges that the *factors* used in the best-interest analysis—adoptability[2] and potential harm—do not have to be proved by clear and convincing evidence, just the overall best-interest finding, *see McFarland v. Arkansas Dep't of Human Servs.,* 91 Ark.App. 323, 210 S.W.3d 143 (2005), but she argues that "nevertheless, there has to be *some* evidence and some finding as to these elements." She further asserts that there was "no evidence from anyone" that explained how appellant's "permissive parenting style" would be harmful to EE's health or safety. We disagree.

Early in Lacey Maybee's testimony, she expressed her opinion that appellant's "parenting has become so negligent that it's dangerous at this point. By dangerous, I mean her not paying attention to her child, allowing her to climb on chairs and tables, playing with scissors that are inappropriate for someone of her age." In addition, the evidence presented by DHS included the following: background evidence of appellant's history with the Louisiana DHS and its concerns about her substance abuse and her sometimes chaotic and violent living situations; the circumstances under which EE came into DHS custody, which involved anonymous tips that appellant was too drunk to care for EE and that she had a violent relationship with a boyfriend who also drank excessively and drove recklessly with EE in the car; even though appellant's random tests were all negative, she offered less than satisfactory explanations about her AA sign-in sheets, ultimately revealing that her neighbor was the person who signed for her; further, appellant's own testimony included this self-assessment, "I think I have an issue with alcohol. It's something I'm trying to beat, though"; appellant did not get an AA sponsor until three weeks after the last hearing; appellant's drug

---

**2.** Appellant does not contest the adoptability finding.

and alcohol evaluation revealed that she was impulsive and manipulative with limited insight into her own behavior; and her psychological evaluation concluded that she exhibited a narcissistic personality disorder that caused her to blame others for her problems, to deny responsibility for her conduct, and to exercise poor judgment.

Regarding appellant's parenting skills, the trial court was faced with evidence that appellant drank during unsupervised visits with EE, prompting the attorney ad litem to request the court to order future visits to be supervised; that during the supervised visits, SSAs noted concerns about appellant's ability to parent her child, in that she did not stop or correct inappropriate, and sometimes unsafe, behavior, and exhibited a generally inattentive approach; that she spoke and played with EE in a childlike manner; that she exhibited resistance to constructive coaching; and that her reaction to these contact reports was that the DHS workers were lying. In addition, appellant's job status was shaky, in that she was working as an independent contractor selling meat; her "good prospects" for obtaining a financial job from the internet were less than reassuring; her plan for reintegrating EE into her life included employing a babysitter, who, it was eventually revealed, had been removed from her home by the State; and appellant's efforts to attend beauty school were cut short when she was forced to quit school after verbally assaulting someone at the school.

In short, we are not left with a definite and firm conviction that the trial court made a mistake in finding that it was in EE's best interest to terminate appellant's parental rights.

### 2) DHS's reunification efforts

■ The statutory ground relied upon by DHS in urging termination was that EE had been found dependent-neglected and out of appellant's care for at least twelve months and that despite meaningful efforts by DHS to rehabilitate appellant and correct the conditions that caused EE's removal, those conditions were not remedied. *See* Ark.Code Ann. § 9–27–341(b)(3)(B)(i)(a). Appellant does not dispute that EE had been adjudicated dependent-neglected and that she had remained out of appellant's custody for seventeen months. What she does dispute is the trial court's finding "that DHS made meaningful reunification efforts."

■ Citing *Jones–Lee, supra,* appellant acknowledges that she is somewhat limited in making her argument because she did not appeal from the trial court's earlier determinations that DHS had made reasonable efforts to rehabilitate.[3] Rather, she contends that the *Jones–Lee* line of cases should be tempered "when there is evidence that even where DHS made some efforts, even sufficient efforts up through an appealable hearing such as a review hearing, DHS can drop the ball as the case continues and in such circumstances, a

---

**3.** Within this argument, appellant makes the following statements: "There was a permanency planning hearing on August 18, 2009, but the order from that hearing was not entered until March 10, 2010, three months after the TPR hearing and the day before the TPR order was entered. Appellant was unable to appeal from the court's finding of reasonable efforts at permanency planning because of this delay." Even though she makes these statements, she does not really develop an argument in that regard. Moreover, as noted by DHS in its brief, her inability to appeal from the trial court's reasonable-efforts findings at the permanency-planning hearing was never raised below and therefore was not properly preserved for this court's review. Consequently, to the extent that this issue is raised on appeal, we do not address it.

parent ought to be able to cite those failures which occur as the case proceeds." She asserts that is what happened here and that appellant needed "focused one-on-one counseling in a treatment setting," rather than occasional intervention by an aide during visitation. She urges reversal of the termination on this basis. We disagree.

As we explained in *Jones–Lee, supra,* the failure to appeal from any of the previous orders in which a trial court has determined that DHS made meaningful efforts toward reunification precludes this court from reviewing those findings with respect to the periods of time covered by those prior orders. The lapse of time between the August 18, 2009 permanency-planning hearing, see footnote 3, and the January 21, 2010 termination hearing represents a period of approximately five months. While appellant had completed parenting classes long before then, she was still engaged in supervised visitation periods where she was sometimes described as disinterested and continued to exhibit inappropriate parenting methods. Moreover, it was her own absences from counseling that resulted in her being dropped by her choice of counselors, and as soon as DHS was made aware of that situation, they gave her a referral to Kathleen Housley.

At the conclusion of the termination hearing, the trial court commented that appellant's negligence in parenting *"could have been better handled by the Department.* Once having identified the issue of apparent inability to grasp what parenting is needed, the Department could have—and in the Court's estimation, *probably should have*—focused in on that issue, and redoubled its efforts to provide whatever kind of service they may have had, to try to establish that she just wasn't getting it." (Emphasis added.) Having noted this criticism of DHS's handling of the situation, however, the trial court still found that DHS had made meaningful efforts to rehabilitate appellant's parenting problems. Again, we are not left with a definite and firm conviction that the trial court made a mistake in finding that DHS had made meaningful efforts to rehabilitate appellant's parenting problems and reunite her with EE.

Affirmed.

VAUGHT, C.J., and BAKER, J., agree.