RITA W. GRUBER, Chief Judge
Megan Pearson and James Wells appeal from the Pulaski County Circuit Court's order terminating their parental rights to their three children, SW, born April 6, 2009; LW, born May 29, 2014; and TW, born August 3, 2015. Neither parent challenges the grounds for termination. Pearson contends that the circuit court abused its discretion in denying her motion for a continuance and that there was insufficient evidence that termination was in the children's best interest. Wells's sole point on appeal is that the evidence was insufficient to support the circuit court's decision that termination was in the children's best interest. We affirm the circuit court's decision.
*421 The case began on September 6, 2016, when the Arkansas Department of Human Services (DHS) took emergency custody of the children after Pearson was involved in a car accident with TW in the car. Pearson admitted to having drunk a beer and ingested Xanax earlier in the day. On October 26, 2016, the circuit court entered an order adjudicating the children dependent-neglected due to neglect and parental unfitness by the mother. Pearson stipulated to the finding. The court specifically noted that Wells, the noncustodial parent, did not contribute to the dependency-neglect. Wells did not attend the hearing. The court found that Wells was not a fit parent for custody and that it considered credible testimony that he was "armed and dangerous" and had outstanding arrest warrants on commercial-burglary charges.
The case goal was set as reunification with a concurrent goal of obtaining a guardian. The case was also placed in the court's "Zero to Three" program that allowed for more frequent review hearings and additional services. Pearson and Wells were both ordered to cooperate with DHS and notify DHS of any change in their residences, employment, or contact information; notify DHS if transportation assistance was needed; participate in individual and family counseling with a domestic-violence component; take medications as prescribed; refrain from the use of illegal drugs; undergo a drug-and-alcohol assessment; submit to random drug screens every two weeks; complete parenting classes; obtain and maintain safe, stable, and clean housing; obtain and maintain stable employment and income; demonstrate the ability to protect the children and keep them safe; and resolve paternity issues regarding LW and SW. Pearson was also ordered to attend all of the children's medical appointments, and Wells was ordered to have a psychological evaluation and follow its recommendations.
During Zero to Three review hearings in November and December 2016, the court recognized Pearson's progress in working the case plan but did not find that the children's health and safety could be adequately protected by her if returned home at that point. Wells did not attend the November review hearing, and the court found that he had failed to comply with the case plan and had not provided DHS with his contact information. Although Wells attended the December review hearing, the court found that he had not complied with the case plan, was incarcerated, and had drug and mental-health issues that needed to be addressed. The children were placed in the temporary custody of their paternal great-grandmother, Shirley Connell, on December 2, 2016.
At a review hearing on January 25, 2017, the court found that the placement with Ms. Connell was not a safe placement due to her forgetfulness in allowing a fifteen-year-old boy with PTSD to watch LW and TW overnight. In addition, the court was "gravely concerned" about Ms. Connell's allowing SW to stay overnight at least once a week with "Paw Paw," a former boyfriend of the children's paternal grandmother, and a person about whom DHS had little knowledge. SW testified that she sometimes slept in his bed and that she did not like sleeping there. The court found Pearson had complied with the case plan, had applied for a job, had not missed any visits with the children, and was making progress toward alleviating the cause of removal. Wells was still incarcerated but had submitted to DNA testing.
At the review hearing held on March 9, 2017, Wells was still incarcerated. Pearson had made "some progress" and had "more than partially complied" with the case plan. The court noted that Pearson had not attended all of her therapy sessions, *422 however, and had made "limited progress" in that area. She also had not been to any of the children's medical appointments as ordered. At a review hearing on April 13, 2017, the court again found that Pearson was making progress but that she had missed some visits with the children, had missed a therapy appointment with LW, and remained unemployed. The court granted Pearson's request to reduce her visitation. The court found that Wells had complied to the extent possible but remained incarcerated.
Wells was released from prison and awarded visitation with the children in June 2017. Following the review hearing on July 20, 2017, the court found that Pearson had "partially complied" with the case plan and that she still was not employed, had no source of income, and did not have stable housing. The court also found that she had missed more visits with the children than she had attended, that she had not participated in therapy sessions with LW, that she had missed two intake appointments for individual therapy and was not addressing her mental-health issues, and that DHS had been unable to locate her from June 30 through July 17. The court found that Pearson was making "little progress" toward alleviating or mitigating the cause of the children's removal. The court was particularly concerned about Pearson's judgment because she was living with a boyfriend who did not support her goal to regain custody of her children. The court found that Wells had missed some visits with the children and had tested positive for illegal substances.
DHS and the attorney ad litem filed a joint petition for termination on August 28, 2017, alleging the grounds of subsequent factors, aggravated circumstances, and failure to remedy. Specifically regarding Pearson, the petition alleged that she had moved in with Wells, had been minimally compliant with the case plan and court orders, and had participated in only two visits since the previous court hearing. The petition also alleged that Pearson had tested positive for alcohol on August 23, 2017, and had not made herself available for biweekly drug-and-alcohol screens. With regard to Wells, the petition alleged that, since the last hearing, he had been minimally compliant with the case plan, had tested positive for alcohol, had an abnormal drug screen on August 23, 2017, had not scheduled a drug-and-alcohol assessment, and had participated in only two visits with the children.
On August 30, 2017, two days after the petition was filed, the court held a permanency-planning hearing. In the permanency-planning order, the court found that the permanency goals should be "to authorize a plan to obtain a guardian AND authorize a plan to obtain a permanent custodian, including permanent custody with a fit and willing relative." The court also found that adoption was not in the children's best interest because they had "a bond with their mother and father." However, the court also found that neither parent was in a position to have the children placed with them within a time frame consistent with the children's developmental needs. Specifically, the court found that both parents were complying with some of the case plan and orders of the court but that neither was making significant, measurable progress toward achieving the goals in the case plan or diligently working toward reunification. Pearson had no stable home and no source of income. The court found that Pearson's visits with the children were appropriate but that she visited them inconsistently and had not participated in court-ordered counseling with SW or parent-child interaction therapy with LW. The court also noted that Pearson had not complied with the recommendations of her psychological evaluation and had not addressed *423 her own mental-health or medical-management issues. The court found that Wells had not submitted to a drug-and-alcohol assessment as ordered, had failed to submit a hair-shaft drug test as ordered, had used marijuana, and had tampered with a drug screen by mixing lemonade in it. The court also found that he had not completed his psychological evaluation, had not participated in individual counseling, did not have a source of income, had missed six visits with the children since the last hearing, and did not attend the family team meeting. Finally, the court also found that the children had been placed together in the same foster home after having spent many months separated from each other and that they were doing well.
The termination hearing was held less than two months later on October 20, 2017. Before any testimony was presented, the court addressed a motion from Pearson's attorney. Pearson had been represented throughout the case by her court-appointed attorney, Phil Beuth. Because he was unable to attend the termination hearing, Mr. Beuth had asked Brian Butler to act as substitute counsel. After DHS's opening remarks, Mr. Butler told the court that he had spoken with Pearson; had informed her that he was well prepared to try the case; and had studied the case, the previous orders, and the case plan. He said that Pearson had told him she did not "feel comfortable" having him represent her, having met him for the first time at the hearing. According to Mr. Butler, Pearson preferred that Mr. Beuth try the case. DHS's attorney responded that she had worked with Mr. Butler and found him to be a capable and competent attorney; she asked the court to deny Pearson's motion. The attorney ad litem stated that her clients had a right to permanency without undue delay, that DHS and the ad litem had multiple witnesses subpoenaed for the hearing, that Pearson had not attended the family team meeting where she could have spoken with Mr. Beuth about his schedule, and that Pearson had not kept in touch with Mr. Beuth. The ad litem explained that a continuance would be "extremely prejudicial" to her clients, particularly SW, who had a "very high level of anxiety" about testifying at the hearing. The court denied the motion, stating that everyone was available and ready for the hearing and that Mr. Butler was a good lawyer, had indicated that he had familiarized himself with the case file, had handled Zero to Three cases before, and was "perfectly capable" of providing the representation needed.
Eight-year-old SW testified first. She stated that she felt worried at the visits with her parents because they asked her whether she loved them and wanted to come home. She said that she did not want them to know that she did not want to go home with them. SW's school counselor also testified that she had known SW for years and that SW had begun to see her more frequently than in the past and that she was very upset and nervous on a more frequent basis. She explained that SW was nervous, scared, and upset before visits with her parents and upset after the visits. The counselor's impression was that SW's visits with her parents had not been beneficial to her and were unhealthy.
Joy Pemberton, a clinical psychologist with the UAMS Child Study Center, testified that she began seeing LW and Pearson for parent-child interaction therapy (PCIT) in March 2017. Ms. Pemberton testified that the therapy was designed to be weekly, but she had not had a session with LW and Pearson since July 2017, although the sessions remained scheduled. Ms. Pemberton testified that LW had continued to demonstrate defiant behaviors, which was to be addressed during phase *424 two of the therapy. Because Pearson did not continue with regular attendance, she did not progress to phase two of the PCIT therapy.
Dr. Karin Vanderzee, a child psychologist at the UAMS Child Study Center, testified that she had been SW's therapist since June 2017. She said that SW had initially improved but had regressed in the month or so before the hearing, experiencing incidents of anxiety. According to Dr. Vanderzee, SW did not want to visit her parents because she felt unsafe and frightened.
Selina Porter, a DHS caseworker, testified that she had supervised visits with the children and their parents. She said that Pearson interacted normally with the children during visits but that Wells was stern and aggressive. She said that his visits were characterized by a lot of aggressive touching and grabbing the girls. She said during one visit, she observed Wells pinning TW on the floor and holding a broom raised in his other hand over the child. On the same day, she witnessed Wells holding TW in a highchair for about ten minutes. Several days later, she noticed that TW had bruises on her arm where Wells had held her.
Darneshia Bell, a specialist for the Safe Babies Court Teams, recommended that the children be adopted because it was "the safest and surest route for permanency for these children who have experienced a very high level of trauma." She stated that at the beginning of the case, maintaining the biological bond with the family was very important, but given that the children had experienced additional "compound trauma" from having several placements and because the parents had missed opportunities for therapy with the children, the children were still "wearing that trauma" and the next placement of the children should be their final placement. She expressed concern that if the case closed without the most "legally secure placement," it would be a setback for the children later.
The DHS adoption specialist testified that the children were adoptable as a sibling group. The children's foster mother testified that she was supportive of what was in the children's best interest and that she wanted to adopt the three children.
The DHS family caseworker, Nicki Baker, testified that there had been several recent drug screens for both parents that had been designated by the labs as "abnormal" and unusually diluted. In addition, a test from September 28, 2017, indicated that Pearson was positive for buprenorphine. A test on Wells on October 12, 2017, indicated that Wells was positive for buprenorphine. Mr. Baker testified that the drug and alcohol use by Pearson had not been resolved. He expressed concern with the credibility of both parents, whose diluted drug screens suggested that they would "do whatever they needed to do" to tamper with the screens to show that they were negative. He said that both parents had been inconsistent in their visits with the children and their willingness to participate in the case plan, and he opined that it is in the children's best interest for the parental rights to be terminated and for the children to be put in a "forever home" where they could get closure and thrive.
He also testified that DHS had explored placement with relatives, including the maternal grandmother, Candida Pearson, whose home was appropriate, but who was later rejected as having an issue with her background. She had failed to disclose that her daughter had once been in foster care. In addition, her husband, the children's grandfather, had not ever visited the children while they were in foster care for the year before the hearing. Mr. Baker also said he spoke with a cousin, Sarah Thompson, *425 who was approved for provisional placement but who did not want to be considered for placement. Finally, he said that he had spoken with Catherine Griggs, the children's maternal great-aunt, who was a potential placement. The paperwork on Ms. Griggs was completed on October 16, 2017, several days before the termination hearing.
Pearson did not testify. Wells did testify and admitted that he had missed the October 13, 2017, family team meeting and that he had missed some visits with the children. He could not recall why he had missed them. He agreed that he had a problem with addiction and said that he would need to "go somewhere inpatient" in order to resolve his issues. He also testified that he was "absolutely not" ready to have custody of his children and thought it was best for them to be in a relative placement. He said that he did not want his children to be adopted because he would like to regain custody if he could get sober in the future. He admitted that he "absolutely" had been intoxicated since the previous hearing.
We review termination-of-parental-rights cases de novo. Dinkins v. Ark. Dep't of Human Servs. , 344 Ark. 207, 40 S.W.3d 286 (2001). At least one statutory ground must exist, in addition to a finding that it is in the child's best interest to terminate parental rights, considering the likelihood that the child will be adopted if the parent's rights are terminated and the potential harm caused by returning the child to the custody of the parent.
Fox v. Ark. Dep't of Human Servs. , 2014 Ark. App. 666, at 4, 448 S.W.3d 735, 737. These must be proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341 (Supp. 2017). The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. Shawkey v. Ark. Dep't of Human Servs. , 2017 Ark. App. 2, at 4, 510 S.W.3d 803, 806. Credibility determinations are left to the fact-finder. Id. Finally, the intent behind the termination-of-parental-rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3).
In finding that termination is in the best interest of the child, the circuit court is required to consider the potential harm to the health and safety of the child that might result from returning the child to the parent's custody. Ark. Code Ann. § 9-27-341(b)(3)(A)(ii). The court is not required to find that actual harm would result or to affirmatively identify a potential harm. Dowdy v. Ark. Dep't of Human Servs. , 2009 Ark. App. 180, 314 S.W.3d 722. The potential-harm evidence must be viewed in a forward-looking manner and considered in broad terms. Samuels v. Ark. Dep't of Human Servs. , 2014 Ark. App. 527, 443 S.W.3d 599. Finally, a parent's past behavior is often a good indicator of future behavior and may be viewed as a predictor of likely potential harm should the child be returned to the parent's care and custody. Shawkey , 2017 Ark. App. 2, at 6, 510 S.W.3d at 807 ; Helvey v. Ark. Dep't of Human Servs. , 2016 Ark. App. 418, at 10, 501 S.W.3d 398, 404.
I. Motion for Continuance
We turn first to Pearson's argument that the circuit court abused its discretion in denying her motion for a continuance. She contends that it prejudiced her *426 to arrive at the termination hearing to discover that her attorney, Phil Beuth, would not be there to represent her and that a stranger was there instead. A circuit court shall grant a motion for continuance only upon a showing of good cause and only for so long as is necessary. Jones-Lee v. Ark. Dep't of Human Servs. , 2009 Ark. App. 160, at 19, 316 S.W.3d 261, 271. We will not reverse the denial of a motion for continuance absent an abuse of discretion amounting to a denial of justice. Id. In addition, the appellant must show prejudice from the denial of the motion. Id.
Pearson does not argue that she needed the continuance to obtain additional evidence nor does she explain what Mr. Beuth might have done differently from Mr. Butler had he represented her at the hearing. Rather, she contends that she had expressed her discomfort to the circuit court about being represented by an attorney who was a stranger to her. The attorney ad litem noted that Pearson had failed to attend the family team meeting where she might have spoken with Mr. Beuth about his potential absence and that Pearson had not remained in contact with Mr. Beuth and thus was not aware of his absence until she arrived at the hearing. The court noted that Mr. Butler had ample experience in the juvenile court system and had handled Zero to Three cases before. Mr. Butler stated that he was well prepared and had studied the previous orders and the case plan. The court found that Mr. Butler was "perfectly capable" of providing representation for Pearson and that the witnesses were available and ready for the hearing. The court expressed particular concern that SW was extremely anxious about the hearing and a delay would not be good for her health and well-being. On this record, we hold that the circuit court did not abuse its discretion in denying Pearson's motion for a continuance.
II. Best-Interest Finding
Pearson's second point on appeal, and Wells's only point on appeal, is that there was insufficient evidence that termination was in the children's best interest. Because they make almost identical arguments, we address their points on appeal together. Specifically, they rely on the court's finding at the permanency-planning hearing two months before the termination hearing that adoption was not in the children's best interest. The crux of their argument to us is that this finding is not open to challenge and that the circuit court could not consider facts that occurred before the date of the permanency-planning hearing in making its determination that it was in the children's best interest to terminate their parental rights. They argue that there was no significant evidence after the permanency-planning hearing to support the court's findings regarding adoption and, thus, that we must reverse.
In addressing appellants' argument, we focus first on the purpose of the dependency-neglect statutory scheme. The intent of termination of parental rights is to provide permanency in a juvenile's life in all instances in which the return of a juvenile to the family home is contrary to the juvenile's health, safety, or welfare and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile's perspective. Ark. Code Ann. § 9-27-341(a)(3). Although the statutory scheme allows a court to hold a hearing to finalize a permanency plan for children in dependency-neglect proceedings, a permanency-planning hearing is not a prerequisite to the court's consideration of a petition to terminate parental rights, and either DHS or the attorney ad litem may *427 file a petition to terminate parental rights at any time prior to a permanency-planning hearing, as occurred in this case. See Ark. Code Ann. §§ 9-27-338(b)(1) ; 9-27-341(b)(1)(B). Moreover, adoptability is but one factor for a court to consider when making a best-interest determination. There is no requirement that every factor considered be established by clear and convincing evidence; rather, after consideration of all factors, the evidence must be clear and convincing that termination is in the best interest of the child. Hamman v. Ark. Dep't of Human Servs. , 2014 Ark. App. 295, at 8, 435 S.W.3d 495, 500.
Further, appellants' argument that the court may consider only evidence that arose after the permanency-planning hearing in making its findings under the termination statute is incorrect. The termination statute specifically provides that, in deciding whether it is in the juvenile's best interest to terminate parental rights, the court "shall rely upon the record of the parent's compliance in the entire dependency-neglect case" and evidence presented at the termination hearing. Ark. Code Ann. § 9-27-341(a)(4)(B) (emphasis added); see also Chandler-Sivage v. Ark. Dep't of Human Servs. , 2017 Ark. App. 544, at 2-3, 532 S.W.3d 113, 115. The process through which a parent or parents travel when a child is removed from their home consists of a series of hearings, which all build on one another. Osborne v. Ark. Dep't of Human Servs. , 98 Ark. App. 129, 136, 252 S.W.3d 138, 142 (2007). "[T]he proceedings and orders pertaining to the termination of parental rights [are] in fact a continuation of the original dependency-neglect case." Neves da Rocha v. Ark. Dep't of Human Servs. , 93 Ark. App. 386, 393, 219 S.W.3d 660, 664 (2005) (quoting Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 361, 990 S.W.2d 509, 514 (1999) ).
Here, the court found clear and convincing evidence of grounds to support termination, which neither parent challenges, and found that it was in the children's best interest to terminate Pearson and Wells's parental rights. The court entered nine pages of very specific findings, detailing the parents' progress and lack thereof throughout the course of the case. The court noted that the children were initially taken into emergency custody by DHS after Pearson had a car accident with TW in the car. Pearson was driving after having drunk alcohol and taken Xanax without a prescription. The court also specifically considered testimony at the termination hearing, including that of SW's therapist and her school counselor, that SW had increased symptoms of anxiety in the several weeks leading up to the termination hearing, she did not want to visit her parents because she felt frightened and unsafe, and she was afraid that she would be kidnapped by her parents. In addition, the court found credible the caseworker's testimony that Pearson was very responsive to participating in services at the beginning of the case but that her interest had waned as time progressed.
The court found that Pearson had not completed individual counseling or followed the recommendation of her psychological assessment. The court also found that she had never obtained employment or stable housing and was not able to protect the children and keep them safe. The court found that Pearson had continued to test positive for alcohol and illegal substances and had submitted altered screens, leading to concerns about her truthfulness. These positive and abnormal drug-and-alcohol screens occurred after the permanency-planning hearing. The court also found that Pearson had visited the children inconsistently, which negatively impacted the children and increased *428 their fears and anxiety, and the court found credible SW's testimony that she did not want to want to go home with her parents but was afraid to tell them. Finally, regarding Wells, the court found that he also had tested positive for illegal substances since being released from prison in June 2017 and that the drug screens that were negative had been altered. Most of these screens occurred after the permanency-planning hearing. The court found that Wells had not submitted to a psychological evaluation, had not participated in and completed individual counseling, had not participated in LW's counseling, and had not participated in family team meetings. He also disobeyed the court's orders that the children have no contact with Shirley Connell, the children's paternal great-grandmother, or Darlena Wells, the children's grandmother. He claimed that the children needed to see their grandmother.
The court made the following specific findings regarding best interest:
In making this determination to grant the petition for termination of parental rights, the Court has included its consideration of the following factors: the likelihood that the juveniles will be adopted if the termination of parental rights petition is granted; and the potential harm, specifically addressing the effects on the health and safety of the juveniles, caused by returning the juveniles to the custody of the mother or placing the juveniles in the custody of the father. Returning the juveniles to the mother's custody or placing them in the father's custody would harm the juveniles' emotional health and physical safety. Mother and father have not visited the juveniles consistently, and, during the visits, the juveniles are fearful and anxious. Mother makes decisions that are not appropriate for her or the juveniles, as she did when she started seeing a man who was not supportive of her getting the juveniles back and she failed to keep contact with DHS. Father has used alcohol since he was five (5) years old, and is still drinking alcohol. Mother and father are still using illegal substances. They are still unfit parents.
The Court has no doubt that mother and father love the juveniles and the juveniles love them. Unfortunately, love alone is not enough to make a person a fit and appropriate parent. The Court is not saying that mother and father can never be fit parents, as the Court believes people have the capacity to change. However, these juveniles cannot wait until the parents may become fit. These juveniles deserve permanency and stability without undue delay. DHS has an appropriate plan for permanent placement of the juveniles. That plan is adoption. Testimony has been presented that there is a very good likelihood that juveniles will be adopted if the petition to terminate is granted.
Finally, appellants appear to argue that the court's finding of best interest was erroneous because DHS failed to pursue relative placement. Throughout the case, DHS pursued placement with a relative. The children were actually placed unsuccessfully with their paternal great-grandmother. Mr. Baker testified that various other placements were considered but not approved. Although Mr. Baker testified that the children's great aunt, Ms. Griggs, was a "potential" placement, Ms. Griggs turned in her paperwork at the eleventh hour, just four days before the termination hearing. Appellants presented no evidence about the relationship, if any, between Ms. Griggs and the children. Finally, appellants presented no evidence that there was *429 an approved relative who was ready, willing, and able to take custody of the children at the time of the termination hearing. The court specifically expressed its concern that the children needed permanency and stability "without undue delay." Our de novo review of this record convinces us that the circuit court's finding that it was in the children's best interest for appellants' parental rights to be terminated is not clearly erroneous.
Affirmed.
Harrison and Brown, JJ., agree.